# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A SAMSUNG GALAXY CELL PHONE CURRENTLY IN DEA CUSTODY, FURTHER DESCRIBED IN EXHIBIT A | No. 1:24-mj-<br><br>**FILED UNDER SEAL** |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Nicholas Rich, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—one electronic device—which is described in Attachment A and currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a Special Agent with the U.S. Drug Enforcement Administration ("DEA") and have been since February of 2008. I am presently assigned to the Bangor, Maine, office and have received extensive training pertaining to narcotic investigations and the investigation of various crimes which arise from drug trafficking activities. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(c). As a federal agent, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States. During my employment with DEA, I have participated in numerous investigations relating to the distribution of controlled substances, including cocaine, heroin, fentanyl, methamphetamine, diverted pharmaceuticals, and other substances in violation of the federal anti-drug laws, including Title 21, United States Code, Sections

841 and 846. I have conducted or participated in, among other things, surveillance, the execution of search and arrest warrants, debriefings of informants and confidential sources, and reviews of recorded conversations relating to narcotics trafficking. I have authored drug-related search warrant requests and successfully executed such warrants resulting in the seizure of drugs and other contraband, including firearms. I have also assisted in the execution of numerous drug-related search and arrest warrants. I have received extensive training in the field of narcotics enforcement and investigations. I am very familiar with the habits, methods, routines, practices, and procedures commonly employed by persons engaged in the trafficking of illegal drugs, including the use of the internet, internet platforms, applications, and cellular telephones to facilitate those activities.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to provide the facts necessary for a determination of probable cause for the requested warrant.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of federal law, to include 21 U.S.C. § 841(a)(1), 21 U.S.C. § 846, and 21 U.S.C. § 843(b) (hereinafter "Target Crimes") have been committed by one or more persons. There is also probable cause to search the device described in Attachment A for evidence of these crimes, as described in Attachment B.

## ITEMS TO BE SEARCHED

5.      I seek a warrant to search the item more fully described in Attachment A, hereinafter "the Device." The Device is a Samsung Galaxy A51 Smart Phone, with Serial Number R58R31SX3GL. It was seized from Terry McCafferty on June 4, 2024.

6.      The applied-for warrant would authorize forensic examination of the Device for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

7.      The DEA, together with partner agencies, has been investigating a subject known as "Leon Leon" and "Leon" for utilizing a particular Facebook Account (described for purposes of this affidavit as the "Leon Leon Account") and phone numbers, in the distribution of illegal controlled substances in the Bangor region. Specifically, the DEA has developed information that a Boston resident named Alexis De Leon, together with multiple associates, is using the Leon Leon Account and also cellular telephones to arrange for the distribution of drugs in eastern Maine. Leon and other individuals are making short trips from Boston to the Bangor region to distribute drugs and collect drug proceeds from Maine sub-distributors.

### Pertinent Background

8.      On February 7, 2024, the DEA applied for and obtained a search warrant from this Court in 1:24-mj-34-JCN, which authorized the collection of prospective location information as to a T-Mobile cellular telephone assigned 917-963-3689 (the "3689 number"). The affidavit submitted in support of that application is attached as Exhibit 1. The affidavit in Exhibit 1 explains the background of this investigation and

3

the identification of both the Leon Leon Account and the 3689 number. Exhibit 1 is expressly incorporated herein for purposes of probable cause. On March 7, 2024, the DEA applied for and obtained authority to extend the period of collection as to prospective location information as to the 3689 number. *See* Docket No. 1:24-mj-00070-JCN.

9.    Based on additional information implicating Dianet Soto Sanz as being involved in the Leon DTO, on March 25, 2024, the DEA obtained from this Court a search warrant authorizing collection of prospective location information as to a specific phone number believed to be used by Soto Sanz, in 1:24-mj-00092-LEW (hereinafter the 9629 number). The facts presented in applying for said warrant included the following events:

a.   On February 27, 2024, the DEA requested that Maine State Police Trooper Thomas Pappas stop a particular vehicle, based on physical surveillance and location information received as to the 3689 number. Trooper Pappas stopped the subject vehicle and photographed the following identification cards for the female driver and her two male passengers: (1) Driver: Massachusetts Limited Term Driver's License for Dianet Soto Sanz of Dorchester, Massachusetts; (2) Passenger 1: Expired United States Visa for Ramon Antonio De Leon; (3) Passenger 2: Dominican Republic identification card for Alexis Mariano De Leon. Trooper Pappas did not detect or observe any obvious contraband inside the vehicle but did observe the two male passengers had between them a very large plastic container purporting to be a container for protein powder. He did not otherwise conduct a drug-related investigation and allowed the vehicle to

depart a short time after stopping it. Alexis De Leon appeared to be the individual associated with the 3689 number identified by numerous witnesses as Leon Leon or Leon. Ramon De Leon had been identified as a suspected co-conspirator.

b.  On March 2, 2024, location information showed the 3689 number again traveled to the Bangor region. On March 5, 2024, I interviewed Jane Doe 4[1] at the Penobscot County Jail in Bangor, Maine. Doe stated that on March 2, 2024, she coordinated the purchase of 300 grams of fentanyl from the Leon Leon Account. Doe stated she met with one Hispanic female and two Hispanic males at a specific restaurant in Bangor on that date and purchased approximately 300 grams of fentanyl for $3,000. Doe positively identified Ramon De Leon as one of the two males whom she purchased the 300 grams of fentanyl from on March 2, 2024.

*Jane Doe 5 Interview & Cooperation*

10.     Based on information received pursuant to authority above, the DEA came to believe that Jane Doe 5 was a customer of Leon, due largely to a significant number of contacts between a phone associated with Jane Doe 5 and the 3689 number.[2] On March 29, 2024, I interviewed Jane Doe 5, who admitted to recently

---

[1] Jane DOE 4 was incarcerated at the Penobscot County Jail on a State of Maine arrest warrant for Failure to Appear.  She has prior a criminal history that includes convictions for Assault.  She was purportedly providing information to law enforcement in exchange for consideration towards a pending Maine State charge.

[2] Jane Doe 5 was already involved in an ongoing ATF investigation involving a January 2024 seizure of drugs and guns from her residence and a nearby camper. Jane Doe 5 had previously been interviewed by the ATF in regards to that investigation and did not at that time disclose

purchasing fentanyl from Leon and doing so via communications with the 3689 number. Jane Doe 5 showed communications on her phone which, based on my training and experience, were consistent with her arranging purchases of controlled substances with Leon at the 3689 number.

11.    Following this interview, Jane Doe 5 agreed to perform a controlled purchase of controlled substances from Leon, at the direction of MDEA and DEA. On April 2, 2024, Jane Doe 5 communicated with Leon and coordinated the purchase of approximately 30 grams of fentanyl in Bangor, Maine. On that date, the GPS ping of 3689 number remained in the Dorchester, MA area while the active GPS ping of the 9629 number traveled from Massachusetts to Bangor, Maine. Jane Doe 5 was outfitted with a covert audio and video recording device and provided serialized U.S. Currency. At approximately 12:45 P.M., Agents observed a Massachusetts plated vehicle, registered to Dianet Soto Sanz, arrive to Jane Doe 5's location. Agents subsequently identified the driver as Soto Sanz, and the passenger as Ramon De Leon. Jane Doe 5 met with Ramon De Leon in her vehicle and recorded the purchase of approximately 30 grams of suspected fentanyl for $600.00. The suspected fentanyl was retrieved by agents from Jane Doe 5, and she confirmed she had completed the agreed-upon transaction.

*Identification of the 9606 Number*

12.    Before the events of April 2, 2024, I had come to believe that the individual utilizing the 3689 number would soon be changing that number. As

---

any relationship to the Leon DTO. Jane Doe 5 has a significant criminal history, including prior felony convictions in Maine for drug trafficking, thefts, and burglary.

explained in Exhibit 1, Leon had previously switched phone numbers with his customers, as is common with individuals seeking to avoid law enforcement detection. Jane Doe 5 had also shown me a text message, sent from the 3689 number on approximately March 23, 2024, with the following message: "Greetings, I will change my number tomorrow for security and to take care of myself more I will send you a message with my name Leon tomorrow."

13.     On April 5, 2024, Jane Doe 5 received a message from (207) 735-9606 (the 9606 number) as follows: "Brother, how are you? I'm Leon. This is my new number, brother. I put the Maine number. It's me, Alex." At the direction of agents, Jane Doe 5 messaged the 9606 number regarding an additional purchase of fentanyl. The 9606 number responded: "All right, let me know how for when if for Monday or so."

14.     I noted that, in my experience in this investigation, this manner of communication is consistent with numerous previous messages sent from other accounts associated with the Leon DTO. Additionally, in my experience, it is common for out-of-state drug traffickers to obtain Maine area code 207 phone numbers, in an effort to draw less attention to their phone numbers by drug investigators.

15.     I subsequently confirmed with T-Mobile that the 9606 number is indeed a number with T-Mobile service. I also obtained limited toll records for the 9606 number. The initial information received from T-Mobile was consistent with the number having been activated recently and, in addition, showed the phone had already been in communication with multiple phone numbers believed to be used by Bangor

region customers of the Leon DTO, further confirming the information received on
Jane Doe 5's phone.

16.     Based on the above information and additional information submitted at
that time, I applied for and obtained a warrant to obtain prospective location
information as to the 9606 number from T-Mobile in 1:24-mj-00112-JCN, on April 11,
2024.

17.     On April 18, 2024, the 9606 number messaged Jane Doe 5 and, based on
my training and experience and interpretation of the messages I reviewed, advised her
that he would be in Maine to deliver fentanyl on April 21, 2024. At the direction of
agents, Jane Doe 5 requested to purchase 30 grams of fentanyl for $600. On April 21,
2024, at approximately 7:40 a.m., information provided from T-Mobile showed the
9606 number moving from Dorchester, Massachusetts and towards Maine. Jane Doe 5
later conducted an audio and video recorded controlled purchase of suspected fentanyl
at a business parking lot in Newport, Maine. Specifically, the CI entered the back seat of
a Honda SUV bearing a Massachusetts plate, which was registered to Alexis De Leon in
Massachusetts. She described there being two males in the back seat of the SUV, which
was driven by an unknown female. Jane Doe 5 described the males in the back seat area
as the brothers she had previously purchased from, which I understood to be Ramon
De Leon and Alexis De Leon. She stated she had entered the vehicle and provided the
buy money to Ramon De Leon in exchange for the suspected fentanyl that she later
turned over to agents. I later reviewed the video footage from this buy and identified
both Alexis De Leon and Ramon De Leon as being the vehicle's rear passengers.

8

18.     Following events of April 21, 2024, location data was received from T-Mobile that indicated the 9606 number made multiple additional trips from the Boston region to eastern Maine. These included same-day trips to Maine on April 25, 2024, April 28, 2024, and May 4, 2024.[3]

*Seizure of the Device*

19.     Based on the above information and additional information submitted at that time, I applied for and obtained a warrant to continue to obtain prospective location information as to the 9606 number from T-Mobile in 1:24-mj-00151-JCN, on May 8, 2024.

20.     Leading up to June 4, 2024, Jane Doe 5 forwarded agents communications that, based on my interpretation of those messages, showed Leon intended to travel to the Bangor region again on June 4th. On June 4th, the location data from T-Mobile again showed the 9606 number move from Massachusetts and into the Bangor region. Agents in the Bangor region identified the white Honda SUV that has been associated with Leon on other trips and conducted surveillance on that vehicle.[4] Three male subjects were observed inside the vehicle as it made several stops consistent with drug distribution activities. At one point, Alexis De Leon was observed exiting that vehicle and briefly entering a dark sedan near a Kenduskeag, Maine

---

[3] There have been other developments, warrants, controlled purchases, and suspected fentanyl seizures in this investigation that are not summarized herein.

[4] A tracker had been installed in the District of Massachusetts, pursuant to authority issued in the U.S. District Court for the District of Massachusetts. Data from the tracker showed the tracker did not leave an area adjacent to Leon's suspected Massachusetts residence. Nonetheless, the white Honda SUV was observed in Maine and location data on the 9606 number put that phone in Maine as well.

residence. A traffic stop was later conducted on that sedan, at the request of drug investigators.

21.     The driver of that vehicle was identified as a female with an East Millinocket address and the lone passenger was identified as Terry McCafferty, also of East Millinocket. The driver was on probation and McCafferty was on bail conditions. Both individuals consented to a search of the vehicle and McCafferty acknowledged he had drugs on his person. What was determined to be approximately 100 grams of suspected fentanyl powder was then removed from his person and seized. McCafferty was mirandized and admitted to arranging the purchase of drugs in Kenduskeag, Maine from a person he knew as "Leon" on that date. Agents showed McCafferty a Facebook photo of Alexis De Leon, whom McCafferty positively identified as the person he knew to be Leon. McCafferty further showed agents a text conversation regarding the sale of fentanyl between himself and De Leon, in which De Leon's phone number was identified as 207-735-9606. McCafferty stated he had purchased fentanyl from Leon on multiple prior occasions. He claimed that the drugs he obtained on June 4th were for personal use. But he also stated he had offered to provide his female driver with drugs.

22.     McCafferty at one point stated that he had purchased fentanyl from Leon three or four times previously, and that he received approximately 50 grams of fentanyl each time. However, at a different point in the interview he also stated he had purchased from Leon throughout 2023. He said he stopped his purchases around Christmas of 2023, at which point he overdosed. He stated he was then clean until he decided to buy drugs from Leon again in June of 2024. Based on the rest of the facts developed in this investigation, I believe Leon was making drug distribution trips to the

Bangor region weekly or sometimes bi-weekly. McCafferty did not claim to be a steady customer of Leon and I understood him to state that his 3-4 purchases spanned much more than 3-4 consecutive weeks. Additionally, I believe, based on my experience and the facts of this investigation that McCafferty likely had to communicate with Leon over some additional period prior to Leon being willing to meet to provide him with drugs in November/December 2023, and also in June 2024. These communications also likely involved the Device. Other identified purchasers described needing to communicate with Leon over the Leon Leon Account for periods of time in order to earn Leon's trust as a customer. With the statements McCafferty gave, therefore, I believe that his phone would have evidence of relevant communications spanning at least as far back as November 1, 2023.

23.     The Device described in Attachment A contained the text messaging described above, but was not otherwise reviewed. Based on my training and experience, the amount of drugs seized from McCafferty on June 4th is consistent with drugs intended for distribution, as opposed to personal use. As is evident in this investigation, those involved in drug distribution frequently use cellular telephones to coordinate sales and purchase of controlled substances.

*Status of Device to be Searched*

24.     The Device is currently in the lawful possession of DEA. It came into the agency's possession as a result of the seizure describe above. I seek this warrant to be certain that an examination of the Device will comply with the Fourth Amendment and other applicable laws. The Device is currently in storage at an evidence locker at DEA Bangor Post of Duty Office in Hermon, Maine. In my training and experience, I know

that the Device has been stored in a manner in which its contents are, to the extent

material to this investigation, in substantially the same state as they were when the

Device first came into the possession of the DEA.

## TECHNICAL TERMS

25.     Based on my training and experience, I use the following technical terms

to convey the following meanings:

     a.   Wireless telephone:  A wireless telephone (or mobile telephone, or cellular

        telephone) is a handheld wireless device used for voice and data

        communication through radio signals.  These telephones send signals

        through networks of transmitter/receivers, enabling communication with

        other wireless telephones or traditional "land line" telephones.  A wireless

        telephone usually contains a "call log," which records the telephone

        number, date, and time of calls made to and from the phone.  In addition

        to enabling voice communications, wireless telephones offer a broad range

        of capabilities.  These capabilities include: storing names and phone

        numbers in electronic "address books;" sending, receiving, and storing text

        messages and e-mail; taking, sending, receiving, and storing still

        photographs and moving video; storing and playing back audio files;

        storing dates, appointments, and other information on personal calendars;

        and accessing and downloading information from the Internet.  Wireless

        telephones may also include global positioning system ("GPS") technology

        for determining the location of the device.

b.  Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records

of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and

presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

 f. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

26. Based on my training, experience, and research, I know that the Device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. It is also capable of accessing the internet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

27. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

28. *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when.

There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

29. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

30. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

31. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

Nicholas Rich, Special Agent
U.S. Drug Enforcement Administration

17

Sworn to telephonically and signed
electronically in accordance with the
requirements of Rule 4.1 of the Federal Rules
of Criminal Procedure

Date: **Jun 13 2024**

City and state: _____ Bangor, ME _____

_____
*Judge's signature*

John C Nivison U.S. Magistrate Judge
*Printed name and title*

18